**Vanessa ARMSTRONG, Plaintiff,**

v.

**ACCREDITING COUNCIL FOR CONTINUING EDUCATION & TRAINING, INC., et al., Defendants.**

No. CIV. A. 91–3135.

United States District Court,
District of Columbia.

Sept. 30, 1997.

As Amended Oct. 31, 1997.

Michael Tankersley, Washington, DC, for Plaintiff.

Mary G. Fenske, Kenneth Ingram, Whiteford, Taylor & Preston, Washington, DC, Anthony Alexis, Fred E. Haynes, Asst. U.S. Attys., Washington, DC, Henry Weinstock, Nossaman, Guthner & Knox, Los Angeles, CA, for Defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on remand from the Court of Appeals, *Armstrong v. Accrediting Council for Continuing Education and Training, Inc.*, 84 F.3d 1452 (D.C.Cir.1996) (unpublished table decision), and on defendants' renewed motions to dismiss plaintiff's remaining claims pursuant to Fed.R.Civ.P. 12(b)(2) and (6). In the alternative, defendants seek summary judgment on these claims. For the reasons stated below, defendants Bank of America, California Student Loan Finance Corporation, Higher Education Assistance Foundation and the Secretary of Education's motions to dismiss are granted in full in accordance with this opinion.

## I. BACKGROUND

### A. Factual Background

As this motion comes before the court under Fed.R.Civ.P. 12(b)(2) and (6), defendants must prove that there is no set of facts upon which plaintiff is entitled to relief as a matter of law. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) All allegations set forth in the complaint must be accepted as true and liberally construed in favor of plaintiff and all reasonable inferences must be drawn in favor of plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The complaint should be dismissed only if it appears beyond doubt that there is no set of facts proffered in support of plaintiff's claim that would entitle her to relief. *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987).

Plaintiff Vanessa Armstrong enrolled in the Washington, D.C. campus of NBS Automotive School ("NBS"), a for-profit vocational school, in June 1988. At the time of her enrollment, NBS informed plaintiff that tuition for the program would exceed $5,000 but that the school could arrange a guaranteed student loan ("GSL") to pay most of the charges. According to plaintiff's amended complaint, NBS represented to her that its program was accredited by the Accrediting Council for Continuing Education and Training ("ACCET"), approved by the D.C. Educational Licensure Commission and certified by the Department of Education ("DOE" or "Department") as an "eligible institution" under the GSL program and the Higher Education Act of 1965, 20 U.S.C. § 1070 *et. seq.* ("HEA"). Plaintiff Armstrong paid $1,317.91 directly to NBS, and NBS presented her with a loan application and promissory note for a GSL loan of $4,000, representing the balance of the tuition and fees.

According to the amended complaint, NBS "prepared the loan application and promissory note presented to plaintiff Armstrong, selected the lender and guarantee agency, specified the type of loan, determined the loan amount, made disclosures concerning the terms of the GSL loan, had plaintiff sign the promissory note, and disbursed the loan proceeds." Plaintiff's Amended Complaint at 8. The note provided that the loan was to be issued by First Independent Trust Company of California ("FITCO"), with the Higher Education Assistance Foundation ("HEAF") acting as guarantor. Plaintiff signed the application and the note on July 19, 1988. NBS certified that plaintiff met eligibility requirements for the loan, at which time FITCO and HEAF approved the loan and paid the proceeds to NBS.

Bank of America ("BA"), an eligible lender under 20 U.S.C. § 1085(d), subsequently purchased the plaintiff's GSL as trustee for the California Student Loan Finance Corporation ("CSLFC"), a corporation which acquires student loans under the HEA. BA is the current "holder" of the note. See 20 U.S.C. § 1085(i). FITCO, the original lender, was not named as a defendant in this action.

In or about December 1989, NBS closed its school in the District of Columbia. At the time of the filing of her amended complaint, plaintiff had made payments on her GSL loan of over $1,500. Over the ten year repayment period of the loan, the total of the monthly payments and interest is $7,565.76.

The gravamen of plaintiff's complaint is that she was defrauded by NBS, that the school was "a sham because it did not meet the standards for accreditation and failed to provide the educational training it promised," Plaintiff's Amended Complaint at 1–2, and that she should not be required to repay her creditors for an education she never received. She claims that NBS was falsely accredited, and that she reasonably relied on NBS's representations concerning its program in deciding to enroll. Plaintiff initially filed a four-claim complaint, naming as defendants CSLFC, BA, HEAF, the Secretary of Education ("the Secretary") (as ultimate guarantor of all GSLs) and ACCET, the agency that granted accreditation to NBS, allowing the school to qualify for federal funds under the HEA. Plaintiff filed her amended complaint in October 1993 pursuant to this court's order in *Armstrong v. Accrediting Council for Continuing Education & Training, Inc.,* 832 F.Supp. 419, 435 (D.D.C.1993) ("*Armstrong I*"), revising her claims against the Secretary

and ACCET. Significantly, NBS has never been a party to this action.

## B. Procedural History

In *Armstrong I*, this court held first that plaintiff could not assert a cause of action against defendants CSLFC/BA[1], HEAF, or the Secretary on common-law contract grounds of mistake or illegality.[2] *Armstrong I*, 832 F.Supp. at 426–27. Second, the court dismissed claims asserted under various sections of the D.C.Code, including §§ 28–3807, 3809 and 3813(f), concluding that although the HEA does not explicitly or implicitly preempt all state law, the particular statutory claims asserted by plaintiff were preempted because it was either impossible for an individual to abide by both the state law and the HEA, or enforcement of the D.C. statutory claims would preclude execution of the purposes and objectives of the HEA. *See id.* at 427–31. Third, the court dismissed both federal law and D.C. statutory/regulatory claims purportedly arising under the FTC Holder Rule, 16 C.F.R. § 433.2. *See id.* at 431–33. Finally, this court dismissed plaintiff's claims based on the existence of an "origination relationship" under 34 C.F.R. § 682.200 between the school and the initial lender against all defendants except the Secretary. *See id.* at 433–34.

On appeal, the D.C.Circuit vacated the above ruling and remanded the matter for further consideration. *Armstrong v. Accrediting Council for Continuing Education & Training, Inc.*, 84 F.3d 1452 (D.C.Cir.1996) (*"Armstrong II"*) (unpublished table decision). The Court of Appeals directed this court to consider first whether, in the absence of any remaining federal law claims, jurisdiction should be maintained under 28 U.S.C. § 1367(C)(3). After reviewing the written submissions and oral arguments of all parties, the court decided to exercise jurisdiction and reach the merits of plaintiff's case, and further determined that declaratory relief was appropriate as to the pendent state claims. *Armstrong v. Accrediting Council for Continuing Education & Training, Inc.*, 950 F.Supp. 1 (D.D.C.1996) (*"Armstrong III"*).

Having decided to exercise its jurisdiction, this court must now consider the remaining questions presented to it by the Court of Appeals. Specifically, this court is called upon to: 1. determine applicable state law under contemporary choice of law principles; 2. consider whether that law is preempted by the federal Higher Education Act; and, 3. if the state law is not preempted, review the application of the relevant law to plaintiff's claims.

Second, the Secretary has now moved to dismiss the claims against him based upon an alleged "origination relationship" between NBS and FITCO. This court will address that question pursuant to the Secretary's and HEAF's Renewed Motion to Dismiss.

Finally, in plaintiff's amended complaint, her second claim for relief alleges a cause of action against the Secretary under 20 U.S.C. §§ 1087(c)(1), (5) which directs the Secretary to discharge a borrower's liability by repaying the amount owed on the loan on all GSLs received on or after January 1, 1986 and report such discharge to credit bureaus if the student's eligibility under the HEA was falsely certified by the institution or if the student was unable to complete the program due to closure of the institution. Plaintiff alleges that she has been injured by the failure of the Secretary to perform these statutory obligations, and asks for relief in the form of a declaratory judgment and a writ of mandamus compelling the Secretary to perform his duties.

---

1. Because the relationship between Bank of America and the California Student Loan Finance Corporation make their interests identical and all motions have been filed jointly, they will hereinafter be referred to singularly as BA/CSLFC.

2. *Armstrong I* also addressed claims against AC-CET based on portions of the District of Columbia Consumer Protection Procedures Act, D.C.Code § 28–3904 (unfair trade practices) and common-law misrepresentation, with the former claim being dismissed. *Armstrong I*, 832 F.Supp. at 423–26. Cross-motions for summary judgment on the common-law misrepresentation claim were denied in *Armstrong v. Accrediting Council for Continuing Education & Training, Inc.*, 961 F.Supp. 305 (D.D.C.1997) (*"Armstrong IV"*), and therefore need not be revisited in this opinion.

## II.  CHOICE OF LAW

In her complaint, plaintiff asserted a number of causes of action under District of Columbia law, including, *inter alia*, D.C.Code §§ 28–3809(a)(1), 28–3904(a), (b), (e), (f), (r); 28–3807; and 16 D.C.Mun.Regs. § 1212.1. However, the Supplemental Loan for Students (SLS) Application/Promissory Note signed by plaintiff included the following provision:

> To the extent not governed by federal law, this note shall be governed by the laws of the jurisdiction where the lender is located.

The original lender, FITCO, was located in Sacramento, California; BA/CSLFC are also California based.  If the contractual choice of law provision is held operative and binding, California law would govern this case, thereby rendering all of plaintiff's District of Columbia claims invalid, with the exception of her claims based upon common-law principles of mistake and illegality, which, as discussed below, have previously been considered and dismissed by this court.  *See Armstrong I*, 832 F.Supp. at 426–27. Whether a choice of law clause in a student loan contract is enforceable is a matter of first impression in this jurisdiction.

A federal court is directed to apply the choice of law rules for the forum in which it sits.  *See A.I. Trade Finance, Inc. v. Petra International Banking Corp.*, 62 F.3d 1454, 1463–64 (D.C.Cir.1995) ("In other settings in which a federal court must rule upon an issue regulated only by state law, it applies the forum state's choice of law rules. . . .").  *See also Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941) ("It is not for the federal courts to thwart such local policies by enforcing an independent "general law" of conflict of laws.").  Consequently, this court will apply choice of law doctrine from the District of Columbia.

Before addressing the applicability of the choice of law clause in the loan contract, there exists a threshold question as to which jurisdiction's law would apply absent the clause.  To determine controlling law, the District of Columbia follows an "interest analysis" approach.  The law governing the case is the law of the jurisdiction with the most "significant relationship" to the matter at issue.  *Trout Unlimited v. United States Dep't of Agriculture*, 944 F.Supp. 13, 19 (D.D.C.1996) (citing *Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F.Supp. 1018, 1026 (D.D.C.1994)); *see also Greycoat Hanover F. Street Limited Partnership v. Liberty Mutual Insurance Co.*, 657 A.2d 764, 767–68 (D.C.App.1995) (noting that the fact that an incident occurred in D.C. is not independently sufficient to require the application of D.C. law).  Plaintiff Armstrong is a Maryland resident and NBS is a Maryland corporation. The initial lender, FITCO, was a California corporation that made the loan from California.  Plaintiff's loan payments were mailed to CSLFC in California; BA, the current holder of the note, is also located in California. Finally, the NBS branch plaintiff attended was located in the District of Columbia, and the loan that is the subject of this action was negotiated and signed by plaintiff at NBS' facilities in the District of Columbia.  Consequently, any of one of three jurisdictions has a substantial nexus to this transaction, and an argument could be made under D.C.'s prevailing "interest analysis" choice of law doctrine that its law should apply.

As among these three options, this court holds that District of Columbia law would govern this action absent the choice of law clause from the loan contract.  First, there is authority for the proposition that when a consumer purchases goods and services in the District, the law of the District governs the contract.  *McCrossin v. Hicks Chevrolet, Inc.*, 248 A.2d 917, 920–21 (D.C.App.1969).  Here, the purchase of the services— signing of the loan agreement— occurred in D.C.  In addition to being the place of contracting, D.C. was also the place of performance and the location of the subject matter of the contract, NBS.  These factors tip the balance in favor of recognizing D.C. law as the relevant law but for the choice of law clause.

District of Columbia choice of law doctrine recognizes the ability of parties to select the operative law they wish to govern a transaction as part of their freedom of

contract, provided that the jurisdiction selected has a "substantial relationship" to the parties or the transaction. *Norris v. Norris,* 419 A.2d 982, 984 (D.C.App.1980). A recent enunciation of this "substantial relation" test, recognizing the validity of a choice of law clause, is found in *Ekstrom v. Value Health Inc.,* 68 F.3d 1391, 1394 (D.C.Cir.1995), in which the court cited *Norris* and upheld the selection of Connecticut law on contracts and arbitrability because the surviving entity in a merger operated principally in Connecticut. *See also Gray v. American Express Co.,* 743 F.2d 10, 17 (D.C.Cir.1984) (applying Maryland choice of law principles in upholding the contractual selection of New York law because one of the parties was a New York corporation and the choice bore some substantial relation to the parties or their transaction); *cf. Milanovich v. Costa Crociere,* 954 F.2d 763, 767 (D.C.Cir.1992) (noting that under American law, choice of law provisions are usually honored); Restatement (Second) of Conflict of Laws § 187 (1971).

■ There is little question that California has a substantial relation to the loan transaction at issue. FITCO, the initial lender, was a California based corporation (as are BA and CSLFC) located in Sacramento. The location of one of the two parties to the loan contract in California creates the critical nexus between the transaction and the jurisdiction indicated in the choice of law clause such that this court is compelled to apply that forum's law. *See Gray,* 743 F.2d at 17 (holding that because American Express was a New York corporation, there was a sufficient basis to defer to the clause calling for the application of New York law). Also contributing to California's "substantial relation" is the fact that the loan was approved by FITCO in California, and the plaintiff made her payments to CSLFC in California.

■ Plaintiff's opposition to the validity of the choice of law clause does not take issue with this application of the "substantial relation" test. Rather, she seeks to avoid the effects of the choice of law provision by claiming that the purpose of the clause was to frustrate the protections afforded by D.C.'s consumer protection laws. See Plaintiff's Opening Memorandum on Resolution of the Merits on Remand at 17 ("Plaintiff's Opening Memorandum"). It is a general principle of choice of law doctrine that if a party or parties stipulate to a given forum's law, that stipulation will not be given effect if it is included for the express purpose of evading otherwise applicable law or is contrary to either public policy or a statute enacted for the protection of that state's citizens. *See, e.g., Allen v. Lloyd's of London,* 94 F.3d 923, 928 (4th Cir.1996) (outlining situations under which choice of law and choice of forum provisions may be found unreasonable); 16 Am.Jur.2d *Conflict of Laws* § 78 (1979).

■ However, the GSL loan contract under consideration here does not present the type of situation in which courts typically invalidate choice of law provisions. FITCO did not deliberately or willfully select California law with the nefarious purpose of avoiding the effect of District of Columbia consumer protection laws. Nor did FITCO endeavor to select a state with particularly relaxed consumer protection laws. The forum selection clause in question is boilerplate language which calls for the application of "the laws of the jurisdiction where the lender is located." It does not specify the selection of any one particular state. Under this clause, had the lender been a District of Columbia bank, the loan contract would have called for the application of District of Columbia law. Had the lender been a Texas bank, the choice of law clause would have directed this court to apply Texas law. In the instant case, because the lender was a California bank, the choice of law clause mandates the application of California law. It may very well be the case that California has a more generous body of consumer protection law than does the District of Columbia. The purpose of this clause had nothing to do with avoiding the District's laws or its public policies. It is both rational and reasonable for a lender to operate consistently under laws of its home state, rather than be forced to operate under 51 different laws depending upon the location of the "object of the loan contract," which is the result that plaintiff's argument would compel.

Furthermore, this is not a case, as plaintiff characterizes it, where a lender seeks to "evade these statutes by making his own laws applicable." Plaintiff's Opening Memorandum at 17 (citing *A. Ehrenzweig, A Treatise on Conflict of Laws* § 204, at 523 (1962)). The choice of law clause was *not inserted by FITCO*. FITCO was utilizing HEAF's standard form promissory note, as it was required to do by law. The note in question, with its boilerplate choice of law clause, was approved by DOE for use throughout the United States. See 34 C.F.R. § 682.401(d)(1) (1990) ("The guaranty agency shall submit to the Secretary its application forms, promissory notes and write-off criteria and procedures. The agency shall not use these materials until the Secretary approves them."). This is hardly the paradigmatic situation in which lenders are trying to "frustrate statutes designed to regulate their conduct." Plaintiff's Opening Memorandum at 18. Rather, FITCO was using the loan form that federal law directed it to use, and was therefore compelled to accept both the benefits and the burdens of the law of the jurisdiction in which it was located—California. Plaintiff must similarly accept the benefits and burdens of California law.

This conclusion, though never expressly reached in this jurisdiction, was hinted at by the D.C.Circuit in *Jackson v. Culinary School of Washington, Ltd.,* 27 F.3d 573 (D.C.Cir.1994) ("*Jackson II*"). In addressing the question as to whether students could utilize the District of Columbia's consumer protection laws to assert defenses against their lenders, the Court of Appeals, in declining to resolve HEA preemption issues, wrote, "we find ourselves unable to say with confidence that D.C. law will apply in any future coercive action brought by the declaratory judgment defendants." *Id.* at 581. In a footnote, the court continued, "To the extent the record points any direction on choice of law, it points against appellants, because several of the loan instruments in the case contain express choice of law provisions iden-

tifying other states' laws as providing the operative rules of decision." *Id.* at 581 n. 14.

Because California has a substantial relation to the transaction, and because the choice of law clause was not inserted with the express purpose of evading otherwise applicable local consumer protection laws, this court will give effect to the choice of law clause in the loan contract. Consequently, to the extent that state law governs this case, California law applies. This court is therefore compelled to dismiss all of plaintiff's claims arising under the both the D.C.Code and D.C. municipal regulations. This conclusion does not, however, leave plaintiff without any state or local law causes of action: she is, of course, entitled to whatever protections may be available under California law, and may seek leave to refile yet another amended complaint.[3]

### III. PREEMPTION

The Court of Appeals next directs this court to determine whether the applicable state law is preempted by the Higher Education Act. Because the plaintiff has not asserted any statutory claims under California law, a full exegesis on this question is not possible, as one cannot determine whether compliance with state law is either "impossible" or "precludes execution of the purposes and objectives of the HEA." *Armstrong I,* 832 F.Supp. at 429.

■ Under *California Federal Savings and Loan Ass'n v. Guerra,* 479 U.S. 272, 280–81, 107 S.Ct. 683, 689–90, 93 L.Ed.2d 613 (1987), preemption occurs if: (1) Congress has expressly declared that state law is preempted; (2) a Congressional intent to "occupy the field" can be inferred because the scheme of regulation is so comprehensive as to preclude the application of state law; (3) state law conflicts with federal law such that compliance with both is either a physical impossibility, or the state law would stand as an obstacle to the accomplishment of the purposes and objectives of the federal law.

---

3. The fact that plaintiff may elect to assert claims under California law does not necessarily mean that she is entitled to the remedies she seeks. She would still need to prove that her state law

claims are not preempted by the HEA, and overcome whatever other hurdles California law presents in stating a claim upon which relief may be granted.

In *Armstrong I*, this court concluded that the HEA neither explicitly nor implicitly preempts all of state law. *Armstrong I*, 832 F.Supp. at 428 (*citing Tipton v. Secretary of Education*, 768 F.Supp. 540 (S.D.W.Va.1991); *see also Jackson v. Culinary School of Washington*, 788 F.Supp. 1233, 1244–46 (D.D.C. 1992) ("*Jackson I*")). Subsequent decisions have reaffirmed this conclusion. *See, e.g., Keams v. Tempe Technical Institute, Inc.*, 39 F.3d 222, 225 (9th Cir.1994) (holding that the HEA does not expressly preempt state common law tort claims against accreditors); *Crawford v. American Institute of Professional Careers, Inc.*, 934 F.Supp. 335, 339 (D.Ariz.1996). Therefore, possible pre-emption of state law by the HEA is a consideration only in cases in which it is either impossible for an individual to abide by both state law and the HEA, or where state law precludes execution of the purposes and objectives of the HEA. *See Armstrong I*, 832 F.Supp. at 429; *Keams*, 39 F.3d at 226–27; *Crawford*, 934 F.Supp. at 339–41.

At this juncture, this court's review of whether the appropriate statutory law is preempted must come to its end, as the court is not currently presented with any California statutory law with which to undertake the necessary analysis. This court will review the pre-emption questions as directed by the Court of Appeals if plaintiff elects to amend her complaint by alleging violations of California consumer protection laws.

## IV. PLAINTIFF'S CLAIMS BASED UPON MISTAKE AND ILLEGALITY

California does recognize the common-law doctrines of mistake and illegality. *See* Cal. Civ.Code § 1576–78 (mistake), 1598–99 (illegality) (West 1982). Therefore, these two claims survive this court's determination that California law applies to the loan agreement.

As plaintiff states in her Opening Memorandum, "[t]here is no need to choose between District of Columbia and California law with respect to plaintiff's claims based on common law principles, because there is no conflict between the potentially applicable state laws on these common law issues." Plaintiff's Opening Memorandum at 16. Be-

cause there is little difference between the District of Columbia and California on these common-law causes of action, the court's analysis from *Armstrong I* will be applied to these claims on remand. Consequently, this court will again dismiss plaintiff's claims based upon mistake and illegality.

The essence of plaintiff's mistake and illegality claims against CSLFC/BA, HEAF and the Secretary is that NBS did not meet the requirements for an "eligible institution" as defined under 20 U.S.C. § 1085(a) at the time plaintiff received her GSL because NBS's accreditation had expired on May 31, 1987. See 20 U.S.C. § 1085(c)(4) (addressing accreditation of vocational schools). As either an illegal contract, or one based on mistake, it would be voidable by plaintiff. Plaintiff grounds her claim in the language of 34 C.F.R. § 600.40(a)(1)(i), which states that an institution loses its eligibility on the date that it fails to meet any of the Department's eligibility requirements. Plaintiff alleges that it is the June 1, 1987 date on which the school first failed to satisfy the financial responsibility requirements of 34 C.F.R. § 668.13 that should be determinative, and, because her enrollment post-dated that time, the contract is voidable.

In *Armstrong I*, this court held that plaintiff misconstrued the manner in which an institution loses its eligibility, explaining that, under 34 C.F.R. § 668, a school's loss of eligibility cannot precede requisite procedural due process, including notification of the offending school, a hearing before an administrative law judge and even a possible appeal to the Secretary. *Armstrong I*, 832 F.Supp. at 426. Additionally, 34 C.F.R. § 668.94 ("Termination") provides only for prospective changes, proscribing *future* acts by the institution such as making new obligations, or making further guarantee commitments. The retroactive effect prayed for by plaintiffs was held to be contrary to the plain language of the regulation. *Armstrong I*, 832 F.Supp. at 426–27.

Even if this court could be convinced that it had erred on the question of retroactivity, plaintiff would still be unable to advance her illegality or mistake claims as a

matter of law. The Department of Education has issued a definitive statement as to whether *student loans* may retroactively become invalid upon a school's loss of accredited status:

> ED [the Department] considers the loss of institutional eligibility to affect directly only the liability of the institution for Federal subsidies and reinsurance paid on these loans. In either case, the borrower retains all the rights with respect to loan repayment that are contained in the terms of the loan agreements, and ED does not suggest that these loans, whether held by the institution or the lender, are legally unenforceable merely because they were made after the effective date of the loss of institutional eligibility.

58 Fed.Reg. 13,337 (1993). The concept of retroactivity under 34 C.F.R. 600.40(a) is a matter that impacts only the relationship between the school and DOE, not the school and the student, nor the student and DOE. "The regulations [34 C.F.R. §§ 600.40(a), 668.94(b)] are not intended to create any other rights for student borrowers or to suggest that borrowers are excused from repaying loans received to attend that institution." 58 Fed.Reg. 13,337 (1993). If NBS was in fact accredited at the time plaintiff Armstrong entered into her loan contract—and both sides concede that it was—then the inquiry as to whether plaintiff's loan contract was based upon mistake or illegality comes to its end. For purposes of determining the validity of plaintiff's loan, the court is directed to take a snapshot of the world as it existed at time of plaintiff's enrollment, and, in this case, the school was accredited by ACCET. If that accreditation was improvidently granted, that is a matter of concern between the school and DOE, *not* between plaintiff and the lenders and guarantors she has named as defendants.

Plaintiff's request that this court again consider its holding on procedural due process in light of *Beth Rochel Seminary v. Bennett*, 825 F.2d 478 (D.C.Cir.1987) does not significantly advance her argument. In

*Beth Rochel*, DOE sought to recover financial aid funds improperly received by Beth Rochel Seminary because the Department determined that the school did not qualify for participation in the federal program. The Court of Appeals held "[t]he regulation provides that a right to notice and hearing 'does not apply to a determination that .... [a]n institution of higher education fails to meet the statutory definition set forth in section [ ] ... 1201 of the Higher Education Act.' 34 C.F.R. § 668.–71(c)(1) (1986)." *Id.* at 481. Even if plaintiff's claim that procedural due process is not required to retroactively terminate accredited status, *Beth Rochel* still only addresses a *school's* responsibility to make restitution to DOE of funds received. Plaintiff's logical leap from *Beth Rochel* that, "[l]ikewise, under the doctrines of mistake and illegality, NBS's failure to satisfy this essential condition of the loan contracts makes plaintiff's contractual obligations void and unenforceable" is simply too great. Plaintiff's Opening Memorandum at 32. The fact that the school in *Beth Rochel* had to make restitution to the Department does not *ipso facto* prove that defendants here must make restitution to plaintiff, especially in light of the DOE's statement from the Federal Register set out above. The rights of DOE against a school is not neatly analogous to the rights of students against third party lenders and guarantee agencies, as the regulatory structure and case law make clear.

Having dismissed the mistake and illegality claims on the above grounds in *Armstrong I*,[4] this court originally declined to address defendant's claim that the HEA preempts these common-law defenses. The court did state in a footnote, "Should the court have analyzed the issue, it would have determined that allowing plaintiff to raise these defenses certainly would have such a deleterious effect on the GSL program, as discussed in Part IV.B., below, that the court would have found it necessary to preempt these claims." *Armstrong I*, 832 F.Supp. at 427 n. 17. As the Court of Appeals has specifically directed the

---

**4.** This court also dismissed plaintiff's claims based upon mistake and illegality because allocation of the risk of mistake on BA/CSLFC, HEAF and the Secretary was "unwarranted and un-

just." As nothing from the Court of Appeals' opinion affects this analysis, there is no need to revisit this territory.

court to consider the extent to which state law is preempted by the HEA, this court will now address this issue.

The HEA expressly vests the Secretary of Education with exclusive authority to determine the existence, scope and duration of a school's eligibility under HEA programs. 20 U.S.C. § 1099c(a). While the Secretary has the authority to decide whether a particular accreditor's standards warrant approval as a reliable indicator of educational quality, 20 U.S.C. § 1099b(a), the Department itself is barred from interfering in an accrediting agency's assessment regarding individual schools. 20 U.S.C. § 3403(b). This structure for determining whether a school is an "eligible institution" for GSL purposes—involving a carefully-crafted balance between the role of the Secretary and the role of the accreditor—has been affirmatively established by Congress. Were this court to allow plaintiff to proceed on her mistake and illegality claims, this court would be placed in the position of having to determine if, at the time of the signing of the loan contract, eligibility requirements were met despite the fact that NBS was accredited by ACCET. For plaintiff to prevail, this court would have to substitute its judgment for ACCET's and conclude that accreditation was improperly granted. To place the court in this role would be contrary to clear Congressional intent. The courts would become the ultimate arbiters of eligibility, called upon to make fact-based determinations that are best made by experts in the field—professional accreditors. Because state law claims based upon mistake and illegality would require the courts to enter the educational evaluation business, and Congress has by statute provided that the Secretary via accrediting agencies are to make these determinations, the state law claims conflict with the federal claim, and are thereby preempted.[5]

Plaintiff's common-law claims must also be dismissed on preemption grounds because the purposes of the HEA would be frustrated if plaintiff's state law claims of mistake and illegality were allowed to go forward merely because the school should not have been accredited at the time of her matriculation. See *Guerra*, 479 U.S. at 281, 107 S.Ct. at 689–90. In fact, the effects could be devastating. Upon graduation and receipt of a diploma from an otherwise meritorious institution, a student could review the school's financial data at the time of enrollment, seize upon a technical violation of the accreditation rules, and assert a claim that her loan contract was thereby illegal or mistaken.

For example, under 20 U.S.C. § 1099c(c)(2) & 34 C.F.R. § 668.15, a school must maintain prescribed asset-to-liability ratios, operating fund deficits, and the like. Under plaintiff's theory of mistake and illegality, a student could avoid subsequent loan payments if that student could successfully demonstrate to a court of law that the ratio fell below prescribed levels (or the operating deficit rose too high) at the time the student's loans were executed even if the deficiency was not detected at the time by an accrediting agency. Or, theoretically, a student could try to proceed with a claim of supervening illegality if a school's accreditation requirements were not maintained *at any time* during the student's enrollment period. This potential result is all the more troubling because many of the statutory and regulatory criteria governing schools have only a tangential relationship to educational quality from the perspective of the student. For example, there are requirements proscribing a school from having more than 50% of its students enrolled in correspondence courses, or more than 50% of an admissions class composed of students who lack high school diplomas or the recognized equivalent. 20 U.S.C. §§ 1088(a)(3)(B) & (a)(3)(D). Accreditation requirements, while developed for the overall benefit of students, are, at their

---

5. This preemption analysis may affect plaintiff's open claim against ACCET. Because one of the elements of common-law fraud is proof of a false representation, *Blake Construction Co. v. C.J. Coakley Co.*, 431 A.2d 569, 577, this court or a jury may find itself in the position of having to determine whether the school did not meet the requisite accreditation standards during the period of automatic extensions. This would be the exact form of second-guessing that a court is to avoid. Conversely, because proof of fraud also requires "knowledge of falsity," preemption may not be an issue; preemption may not eliminate state law causes of action based on intentional or reckless deceitful acts.

core, a matter between the institution and the DOE and usually are related more to finances than pedagogy. The possibility of students avoiding their loan obligations through canvassing for accreditation violations cautions against creating a private right of action under the HEA, and, in the same vein, disallowing the same private enforcement through the "back door" route of common-law causes of action.

Were such claims to go forward, it would surely be followed quickly by the exit of many lenders from the GSL program. Banks and guaranty agencies would likely be far less generous if they knew their obligations could be cut off via technical violations of accreditation requirements. This result would "preclude the execution and purposes and objectives of the HEA," which is to make funds widely available for students who otherwise cannot afford the opportunities higher education promises. *See* 20 U.S.C. § 1070(a) ("It is the purpose of this part, to assist in making available the benefits of postsecondary education to eligible students in institutions of higher education"); 1980 U.S. Code Cong. & Admin. News pgs. 3141, 3168; 1976 U.S.Code Cong. & Admin. News pgs. 4713, 4731 (recognizing the "massive contribution to financing postsecondary educational opportunities made in the ten years of the operation of the GSLP"). There is a reason why Congress has elected to not create a private right of action under the HEA, and this court refuses to disturb that rationale. To the extent that a resort to state law claims would seriously frustrate Congress' goal of making loans widely available to students while at the same time making participation in this program attractive to lenders, such state law claims must be deemed as preempted. *Accord, Morgan v. Markerdowne Corp.*, 976 F.Supp. 301 (D.N.J.1997).

For the above reasons, plaintiff's state law claims based on the doctrines of mistake and illegality against BA/CSLFC, HEAF and the Secretary must be dismissed.

## V. PLAINTIFF'S ORIGINATION CLAIM AGAINST THE SECRETARY

Having addressed the specific issues posed by the Court of Appeals, this court will note that plaintiff's claims for relief against BA/CSLFC and HEAF—all of which were dismissed in *Armstrong I*—are wholly unaffected by the resolution of the choice of law or preemption questions. Nonetheless, both plaintiff and defendants have dedicated substantial portions of their briefs on remand to issues that were definitively resolved in 1993, most notably claims arising under the FTC Holder Rule.

In *Armstrong I* this court concluded, consistent with the weight of authority, that the FTC Holder Rule, 16 C.F.R. § 433.2, affords plaintiff with no basis for asserting claims and defenses against defendants because the requisite notice was not part of the loan contract. And, even if the Holder Rule's notice was implied into the contract, there would still be no power to grant relief because violations of the Holder Rule do not furnish private parties with a cause of action. *See Armstrong I*, 832 F.Supp. at 431–33 (citing *Holloway v. Bristol–Myers Corp.*, 485 F.2d 986 (D.C.Cir.1973)). Subsequent decisions have only reinforced this court's resolution of that question. *See Bartels v. Alabama Commercial College*, 918 F.Supp. 1565, 1570 (S.D.Ga.1995) ("Even assuming that the FTC Holder Rule applies to student loan transactions, a plaintiff has no rights under the rule if the notice is omitted from the contract. Furthermore, there is no private cause of action under the FTC Holder Rule .... enforcement of the rule is the sole province of the Federal Trade Commission.") (citations omitted); *Markerdowne*, 976 F.Supp. at 312. ("Notwithstanding the conclusion that the FTC Holder Rule was applicable to plaintiff's student loans, the parties agree that violation of the rule does not give rise to a federal private cause of action.").

Furthermore, plaintiff's "origination" claims allegedly arising under 34 C.F.R. § 682.200 against third-party defendants BA/CSLFC and HEAF and do not need to be reanalyzed in light of the Court of Appeals' vacating and remanding of the earlier judgment. The Secretary's "unofficial policy" of not enforcing loans which are the product of an origination relationship is not binding on

third parties, *see Armstrong I,* 832 F.Supp. at 433–34, and plaintiff therefore cannot assert claims and defenses against these parties, even if such a relationship could be proven. Again, subsequent holdings of other courts have buttressed this court's determination that the Secretary's policy of forbearing enforcement of loans when an origination relationship exists cannot be used against lenders and guaranty agencies such as (BA/CSLFC and HEAF) because the APA's rulemaking procedures were not followed in creating the "policy." *See Bartels,* 918 F.Supp. at 1570; *Williams v. National Sch. of Health Tech.,* 836 F.Supp. 273, 284–85 (E.D.Pa.1993) ("Although an agency may choose to bind itself in an informal matter, it cannot regulate third parties other than by utilizing the mechanisms of the APA established for that purpose.") (citation omitted).

■ Consequently, the only origination claim remaining is against the Secretary. In *Armstrong I,* the Secretary did not move to dismiss plaintiff's claims based on an alleged origination relationship. *See Armstrong I,* 832 F.Supp. at 433–34. In his Renewed Motion to Dismiss, the Secretary now seeks to dismiss the origination claims. As the D.C. Circuit has now affirmatively determined that a student does not have a cause of action against the Secretary based on the Secretary's non-enforcement "policy," this court will grant the Secretary's motion to dismiss.[6]

Under 34 C.F.R. § 682.200, an "origination relationship" is a relationship between a school and a lender in which the lender delegates to the school "substantial functions" in the execution of the loan that are normally performed by the lender. Specifically, this "origination relationship" exists where:

(1) A School determines who will receive a loan and the amount of the loan;

(2) The lender has the school verify the identify of the borrower or complete forms normally completed by the lender.

In cases in which an origination relationship exists, the Secretary has a long-standing policy of abstaining from collection. *See, e.g.,* 55

Fed.Reg. 48,327 (1990); Letter from Kenneth D. Whitehead, Acting Assistant Secretary of Education, to Stephen J. Solarz, House of Representatives (May 19, 1988). Plaintiff now wishes to convert this policy into a federal cause of action against the Secretary.

In *Jackson v. Culinary School of Washington, Ltd.,* 27 F.3d 573 (D.C.Cir.1994) (*"Jackson II"*), fifty-nine former students sought declaratory and injunctive relief against various lenders, guarantee agencies and the Secretary· for the actions of the defunct and judgement-proof Culinary School of Washington. Included in plaintiffs' complaint was a claim against the Secretary based upon an alleged origination relationship. The threshold issue considered by the Court of Appeals was as to whether there was a "federally grounded right to enforce the Secretary's alleged promise [to abstain from collections]." *Id.* at 583.

■ In *Jackson II,* the Department conceded its longstanding policy to refrain from enforcing student loans in cases where the lenders and schools were in an origination relationship. *Id.* at 585 (citing *Armstrong I,* 832 F.Supp. at 433–35). The court noted that, in determining whether an agency's "promise" is enforceable by third parties, the relevant inquiry is agency intent. *See id.* at 584 (citing *National Latino Media Coalition v. FCC,* 816 F.2d 785, 788 n. 2 (D.C.Cir.1987) ("the 'binding' quality of a particular rule or statement will depend on whether the agency intended to establish a 'substantive' rule. . . .")). Quoting *Vietnam Veterans v. Secretary of the Navy,* 843 F.2d 528, 537 (D.C.Cir.1988), the Court of Appeals next stated, " 'statements whose language, context and application suggest an intent to bind agency discretion and private party conduct—the sort of statements requiring compliance with [APA] § 553—will have that effect if valid; interpretive rules or policy statements will not, *regardless* of their validity.' " *Id.*

6. Claims based on the alleged origination relationship between FITCO and NBS against the Secretary were dismissed without prejudice by this court's Order of July 25, 1997. Because this

order was vacated by the Court of Appeals in *Armstrong II,* this court will again address this claim.

As to whether the Secretary's "rule" was meant to create substantive rights in third parties, the court first cited the Secretary's position—as described in *Armstrong I*—that "where there is an origination relationship between the school and the lender, the student's claims and defenses as to the school can be asserted as defenses to the loan contract...." *Jackson II*, 27 F.3d at 585. However, on the other side of the balance, the court noted that there had been a proposed regulation on borrower defenses that would have codified the Secretary's policy, 55 Fed.Reg. 48,327 (1990), but this proposal was never adopted by DOE, and, in fact, was explicitly rejected. *See* 57 Fed.Reg. 60,304 (1992) ("the Secretary has decided that it is not desirable at this time to prescribe in regulations a uniform Federal rule regarding borrower defenses that would preempt State law otherwise applicable to FFEL [GSL] programs").[7]

Balancing the arguments in favor of and against creating a substantive cause of action based upon an alleged origination relationship, the *Jackson II* court concluded, "the Secretary has not sufficiently communicated an intention to be bound by his origination policy so as to create a legally enforceable right grounded in federal law." *Jackson II*, 27 F.3d at 585. Additionally, the court opined:

> The paltry fragments suggesting the Department's intent, the amorphous language and unrelated context of the letters, and, finally, the Department's indication in 1992 that it preferred continuation of the regime of state defenses to the promulgation of a uniform federal rule all suggest to us the manifest impropriety of deeming the origination-forbearance policy enforceable by appellants as a matter of federal law.

*Id.* Other jurisdictions have subsequently been in accord with *Jackson II's* conclusion that there is no federal cause of action against the Secretary based upon an alleged origination relationship. In *Bartels*, 918 F.Supp. at 1572, the court considered whether the Secretary's informal policy could be used as a defense to a loan obligation. That court, in accord with *Jackson II*, held, "The Secretary's policy was that the Department of Education would refrain from trying to enforce unenforceable loans, not that an origination relationship creates a private cause of action for breach of contract." *Id.* at 1573. Similarly, in *Williams*, 836 F.Supp. at 285, the court concluded that the Secretary's policy does not afford plaintiff relief against the Secretary. "The Secretary has not indicated that the Department of Education would actively discharge loans based on the existence of an origination relationship but merely that the Secretary would not seek to enforce such loans."

Consistent with this Circuit's holding in *Jackson II*, and the weight of authority from other jurisdictions, plaintiff's federal claim against the Secretary based upon an origination relationship must be dismissed.

VI.*

---

7. This discussion in the Federal Register does identify "four kinds of State laws whose application would not frustrate FFEL program policies and are therefore not preempted by federal law." However, since plaintiff has not pleaded any claims under California statutory law, this court's analysis must presently end upon determining that there is no *federal* claim against the Secretary based upon an origination relationship.

* Editor's Note: Withdrawn by order of 10–31–97.

## VII. CONCLUSION

In their briefing of the issues on remand, plaintiff and defendants conflict over whether this case centers around creating a cause of action against third party lenders and guarantors for "educational malpractice." While this court does not agree with all of defendants' assertions that plaintiff is, through this suit, attempting to assert such a claim, it is undeniable that plaintiff is trying to obtain rescission of her loan agreement based upon her dissatisfaction with the quality of the education she received. As this court concluded in *Armstrong I*, if there was any wrongdoing in this case, it was the wrongdoing of NBS, as NBS is the only party who owed a duty of care to plaintiff as to receiving a promised education in the field of automotive repair. The defendants in this case—BA/CSLFC, HEAF and the Secretary—have acted entirely in accord with the mandates of law.

In the absence of the Guaranteed Student Loan program, the opportunities available through higher education would be beyond the reach of many, if not most, students who seek the chance to better their station in life. To subject lenders to suit based on acts of the educational institutions would surely lead lenders to cease their participation in student loan programs. Most, if not all, courts who have considered the types of claims raised by plaintiff against "the usual suspects", have been vigilant in protecting the GSL and other student loan programs. This court will not depart from the path it took three years ago, and has been taken by almost all of those who have embarked upon this long journey.

Accordingly, the motions to dismiss will be granted in full.

A separate order shall issue this date.

## *ORDER*

This case comes before the court on the renewed motions to dismiss of defendants Bank of America, California Student Loan Finance Corporation, Higher Education Assistance Foundation and the Secretary of Education. Upon consideration of the filings of counsel and the relevant law, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. The motion to dismiss filed by defendants Secretary of Education and Higher Education Assistance Foundation of January 28, 1997 is GRANTED; the second, third and fourth claims for relief are DISMISSED as to the HIGHER EDUCATION ASSISTANCE FOUNDATION and the SECRETARY. The third amended and fourth amended claims for relief are DISMISSED as to the SECRETARY.

2. The motion to dismiss filed by defendants Bank of America and California Student Loan Finance Corporation of January 27, 1997 is GRANTED; the second, third, and fourth claims for relief are DISMISSED as to these defendants.

3. Defendant California Student Loan Finance Corporation's motion for protective order is DENIED AS MOOT.

4. Plaintiff's motion to compel production of documents is DENIED AS MOOT.

5. Plaintiff's motion to substitute the Educational Credit Management Corporation as defendant is GRANTED and the Educational Credit Management Corporation shall hereafter be substituted for the Higher Education Assistance Foundation as defendant herein.

6. A status call on plaintiff's and class claims against the Accrediting Council for Continuing Education & Training, Inc. is scheduled for 4:30 p.m. on Wednesday, October 15, 1997.

SO ORDERED.

## ORDER

Upon consideration of Plaintiff's Motion to Amend Judgment and Motion for Entry of Final Judgment Pursuant to Fed.R.Civ.P. 54(b), and the response thereto, the Court finds that the Memorandum Opinion and Or-

der of September 30, 1997 should be amended as described below, and that there is no just reason for delay entering final judgment dismissing plaintiff's claims against defendants Secretary of Education, Bank of America NT&SA, California Student Loan Finance Corporation, and Higher Education Assistance Foundation and Transitional Guaranty Agency. The claims against these defendants are separable from the fraud claim that remains to be adjudicated against the Accrediting Council for Continuing Education and Training, and this Court's decision to dismiss these claims rests on purely legal issues that can be presented to the Court of Appeals without interfering with the litigation of the remaining claim in this Court. Moreover, there is a danger of hardship if appeal is delayed until the remaining claims are finally adjudicated because of the penalties and sanctions imposed for failure to repay contested student loans. Defendants will not be prejudiced by entry of a final judgment. Thus, both judicial administrative interests and the equities involved favor entry of a final judgment. Therefore, it is hereby, this ___ day of _____, 1997,

ORDERED that plaintiff's motion to amend is granted; and it is further

ORDERED that Section VI of the Court's Memorandum Opinion of September 30, 1997 is hereby withdrawn and the last sentence of paragraph 1 of the Court's Order of September 30, 1997 is amended to read: "The third amended and fourth amended claims for relief are dismissed as to the 'SECRETARY.";** and it is further

ORDERED that the second sentence of footnote 7 of the Court's Memorandum Opinion of September 30, 1997 is hereby amended to read: "However, since plaintiff has not pleaded any claims under California statutory law, this court's analysis must presently end upon determining that there is no *federal* claim against the Secretary based upon an origination relationship.";** and it is further

** Editor's Note: Amendments incorporated for

ORDERED that the Clerk is directed to enter final judgment dismissing the Second, Third, and Fourth Claims for Relief in plaintiff's complaint of December 10, 1991, because this Court determines that there is no just reason for delay in entering final judgment with respect to this Court's decision of September 30, 1997, because the claims that the Court has dismissed as a matter of law are separable from the claims that remain to be adjudicated in this action, and there is a danger of hardship if appeal is delayed until the remaining claims are finally adjudicated.